# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, <br><br> Howard Bruiser Mann, <br><br> Debtor. <br><br> Joan C. Mann, <br><br> Plaintiff, <br><br> v. <br><br> Howard Bruiser Mann, <br><br> Defendant. | Case No. 13-02174-dd <br><br> Adv. Pro. No. 13-80169-dd <br><br> Chapter 7 <br><br><br> **ORDER** |

This adversary proceeding is before the Court on the complaint of the plaintiff, Joan C. Mann ("Plaintiff"), seeking a determination that a debt owed to her by defendant and debtor, Howard Bruiser Mann ("Defendant"), is nondischargeable under 11 U.S.C. §§ 523(a)(5), (a)(6), and (a)(15). Plaintiff also asserts Defendant should be denied a discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(7). Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a). Venue is proper under 28 U.S.C. § 1409. This adversary proceeding is a core proceeding. 28 U.S.C. §§ 157(b)(2)(I), (b)(2)(J).

Defendant, proceeding *pro se*, answered the complaint. A trial was held on May 20, 2014. After careful consideration of the applicable law, arguments of the parties, and evidence submitted, the Court issues the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a), made applicable by Federal Rule of Bankruptcy Procedure 7052.[1]

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

1

**FINDINGS OF FACT**

1. Defendant, proceeding *pro se*, filed the chapter 7 bankruptcy case underlying this adversary proceeding on April 11, 2013. His bankruptcy is captioned *In re Howard Bruiser Mann*, Case No 13-02174-dd., and is pending before this Court.

2. Plaintiff is Defendant's ex-wife.

3. The parties married in 1991, and their marital home was in Virginia Beach, Virginia. They did not have any children during their marriage, but Defendant had two children from a previous marriage.

4. Defendant had health issues, primarily related to a back injury that is probably from his football career. He had a pump implanted under his skin that directed pain medicine to where he had back problems. A nurse came to the house to refill the pump every month and a half. In April 2010, Defendant suffered a medical accident related to the pump as a result of the nurse not getting the medication into the pump. Instead, the medication went directly into Defendant's body, resulting in him going into shock and being hospitalized for some period of time. Defendant was fortunate to survive the accident.

5. While Defendant was in the hospital, Plaintiff discovered Defendant was having an affair with a childhood friend named Linda Ford Banner.

6. When Defendant came home from the hospital, Plaintiff confronted him about the affair. They stayed together for a period of time in an attempt to reconcile. They separated when Plaintiff discovered Defendant was still communicating with Banner, and Plaintiff filed for divorce.

7. Plaintiff testified she did not observe any cognitive defects in Defendant as a result of the medical accident. She testified his mental state was the same as before the accident.

8. On November 20, 2010, Plaintiff and Defendant entered into a Marital and Property Settlement Agreement and Stipulation pursuant to Virginia law. Pl.'s ex. 1. Among other things, this Agreement provided:

a. Defendant would maintain medical/dental/vision insurance coverage for Plaintiff until a final decree of divorce was entered;

b. The marital residence would be sold, and after paying the mortgages on the residence and the costs and fees associated with the sale, Plaintiff would receive 65 percent of the remaining proceeds and Defendant would receive 35 percent;

c. The parties would keep and be responsible for their respective automobiles, in Defendant's case a 2002 GMC Yukon and a 1939 Ford.

d. Each party would assume sole and full responsibility for certain credit card debts and hold the other harmless from any liability associated with the credit cards to be paid by the other;

e. Each party would keep his/her own investments, savings accounts, checking accounts, and similar items;

f. Defendant would retain his interest in a business known as Virginia Pro Team Concepts;

g. Plaintiff would be paid 10% of the proceeds, not to exceed $50,000, from a potential medical malpractice lawsuit Defendant had related to the April 2010 medical accident. Defendant also agreed to pay off all credit card debt listed in the Agreement from his share of the malpractice lawsuit proceeds; and

      h. Defendant would maintain life insurance coverage on himself in the amount of $500,000, naming Plaintiff as the sole beneficiary and paying all premiums until he reached the age of sixty; and

      i. Defendant would have sole ownership of a timeshare in Saint Croix.  *Id*.

9. In addition, the Marital and Property Settlement Agreement contained a paragraph titled "BANKRUPTCY," which stated:

> The parties mutually covenant, represent, warrant, and agree that it is their mutual intent and bargain, which goes to the very essence of this entire Agreement, that the monetary payments, obligations and liabilities assumed and set forth herein for the benefit of the parties, respectively, and/or equitable distribution (including division and distribution of property and retirement benefits), provision and maintenance of health care and/or life insurance benefits and/or coverage, payment of non-covered health care expenses, attorney's fees and costs, debts, payments of educational expenses, and other monetary payments and obligations set forth herein shall be considered, *for the purposes of federal bankruptcy laws, exempt from discharge and nondischargeable in bankruptcy as debts to a spouse or former spouse of the obligor*.  Accordingly, each party hereby acknowledges, agrees and understands that all payments to and for the benefit of the other under this Agreement are in the nature of spousal support, for alimony to, maintenance for, or support of a spouse or former spouse, as actually being in the nature of alimony, maintenance or support as the debts, liabilities, and obligations created by this Agreement are intended for economic security, after considering many facts, circumstances and factors, including the disparity of earning power of the parties, business opportunities, the financial circumstances and needs of the parties, respective levels of physical and mental health, probable future need for support, fault, loss of benefits which would have continued to accrue had the marriage continued, the duration of the marriage, the adequacy of support absent the other monetary obligations assumed herein, the effect hereof being to provide for daily needs and basic living expenses based on the totality of the obligations assumed hereunder.  *To the extent that any obligation of a party under this Agreement is not in the nature of alimony or support, then that obligation is non-dischargeable in bankruptcy because it has been incurred by the responsible party in the court [sic] of a divorce or separation or in connection with a separation agreement, divorce decree or other order*.

*Id*. (emphasis added).

10. On April 25, 2011, Plaintiff and Defendant entered into an amendment to the Marital and Property Settlement Agreement.  *Id*.  Among the amendments were the following:

4

    a. Plaintiff would have exclusive use and possession of the marital residence until it sold. Defendant would be financially responsible for paying joint household bills associated with the marital residence from February 17, 2011, until it sold. In the event Plaintiff helped pay any joint household bills associated with the marital residence, Defendant would be obligated to reimburse Plaintiff for these expenses plus 2% interest from his portion of the proceeds of the sale of the residence. If his share of the proceeds was not sufficient to repay these expenses, Defendant would pay the remaining amount within 30 days of the closing of the sale. The parties agreed these amounts plus interest to be reimbursed to Plaintiff were non-dischargeable in bankruptcy.

    b. The responsibility for payment of Plaintiff's medical/dental/vision insurance was transferred to Plaintiff pending the sale of the marital residence, at which time Defendant would be responsible to reimburse Plaintiff for the premiums she paid out of his share of the proceeds of the sale of the residence.

    c. The credit card debt for which the parties would be responsible was amended to include certain credit card debt that had not been partitioned out to the parties originally. Defendant agreed to indemnify and hold Plaintiff harmless for any and all liability, costs, and expenses associated with the accounts for which he was responsible. This section on credit card debt closed with the following paragraph:

> The dischargeability of debts to third-party creditors in bankruptcy shall have no effect on the obligations, liabilities and debts assumed hereunder for the benefit of the parties respectively, which are in the nature of support and are in the nature of the

5

>   assumption of marital and family obligations intended to maintain the parties, respectively, in a reasonable economic position and to enable them to meet their living expenses which is a function, purpose and substance of the liabilities, obligations and debts assumed hereunder.
>
> d. Defendant would be required to maintain life insurance on himself with Plaintiff designated as beneficiary beyond age sixty. In addition, Plaintiff would pay the premiums on the life insurance policy until the marital residence sold, at which time Defendant would reimburse her out of his share of the proceeds.

*Id*. With the exception of the amendments, the November 20, 2010 Marital and Property Settlement Agreement remained in full force and effect. *Id*.

11.   A state court in Virginia entered a Final Decree of Divorce on June 22, 2011, incorporating the November 20, 2010 Marital and Property Settlement Agreement and April 25, 2011 Amendment thereto. *Id*. The divorce decree denied spousal support "except as may be provided for in the Agreement and the Amendment." *Id*.

12.   Plaintiff was not aware of any reason that Defendant would not have been able to read or understand the Marital and Property Settlement Agreement and Amendment at the time he entered into them.

13.   Subsequently, Defendant moved from Virginia to Georgetown County, South Carolina.

14.   Defendant signed an agreement dated October 5, 2012, to reimburse Plaintiff for moving expenses she paid for him and for a deposit on a place to live she paid for him. *Id*. The amount owed totals some $6,047 in principal plus 2% interest. *Id*. Plaintiff is not seeking a determination of nondischargeability with respect to this loan.

15. In April 2012, Defendant settled his medical malpractice lawsuit for $300,000. Pl.'s ex. 6. He received approximately $155,000 from the proceeds. Defendant did not use any of these funds to pay off the credit card debt for which Defendant was responsible under the Marital and Property Settlement Agreement and Amendment or to reimburse Plaintiff for sums she paid to maintain the marital residence and the life insurance policy on Defendant.

16. Plaintiff asserts she is owed a debt of $83,165.45 that should be declared nondischargeable.[2] This amount consists of the following:

    a. $10,022.00 in joint household bills associated with the marital residence incurred between February 17, 2011, and the sale of the residence Plaintiff paid;

    b. $34,105.85 Plaintiff paid on credit card debt for which Defendant was responsible under the Marital and Property Settlement Agreement and Amendment;

    c. $30,000.00 which represents 10% of Defendant's medical malpractice settlement; and

    d. $9,037.60 in life insurance premiums that Plaintiff paid after Defendant did not pay them.

---

[2] Plaintiff filed a proof of claim for $79,212.45 in Defendant's bankruptcy case. Pl.'s ex. 1. This amount consists of $73,165.45 allegedly owed to her under the Marital and Property Settlement Agreement and Amendment in addition to the $6,047 Plaintiff loaned to Defendant for moving expenses. Again, Plaintiff is not seeking a determination of nondischargeability as to the $6,047 loan. Plaintiff's counsel explained the discrepancy at trial as being the result of miscalculating, when filling out the proof of claim, the amount owed to Plaintiff from Defendant's malpractice settlement at $20,000 rather than $30,000.

17.     Plaintiff paid certain credit cards for which Defendant was responsible under the Marital and Property Settlement Agreement and Amendment after Defendant did not pay them because her name was also on those cards and her credit was at risk.

18.     The rent for the house in which Defendant resides in Georgetown County currently is between $2,700 and $2,900 per month.

19.     Defendant and Banner married at some point after he filed his bankruptcy case.

20.     At trial, Plaintiff's counsel questioned Defendant regarding activity in his Wells Fargo bank account during the year preceding his bankruptcy filing. Pl.'s ex. 8. On April 26, 2012, Defendant deposited $133,681.36 into the account from his malpractice settlement. On May 1, 2012, Defendant paid $1,840 to Carnival Cruise and paid $3,000 on the 1939 Ford. On May 9, 2012, Defendant paid $779.16 to Spirit Airlines. He paid $997.36 to Lazy Boy Furniture on May 10, 2012. He withdrew $400 in cash on May 12, 2012. On May 14, 2012, there is a check for $18,800 that constitute funds Defendant used to help his son purchase a car as part of repaying a debt Defendant testified he owed to his son. On May 15, 2012, there is a $1,349.22 purchase at Best Buy Defendant cannot explain. On May 17, 2012, there is a $9,566.34 check Defendant wrote to save a condo from a tax sale. Banner owned the condo. Defendant and Banner were not yet married at the time the check was written. On May 24, 2012, there is a $63,000 check Defendant wrote to open accounts at First Federal. On May 29, 2012, there are checks of $7,537.13 and $2,713.07 that Defendant wrote to purchase furniture. He returned some of the furniture. On May 30, 2012, Defendant received another $21,353.21 from his malpractice settlement and paid $4,496.91 on a tax lien. There is a $5,000 check on June 12, 2012, that Defendant wrote to his business Virginia Pro Team Concepts. The $5,000 was deposited into another account. Defendant has not provided any documentation related to this

8

other account. He deposited $1,000 into his Wells Fargo account on June 14, 2012. He cannot explain the source of the $1,000. On June 25, 2012, he paid $2,000 for some jewelry for himself and Banner. They were not yet married at the time. Defendant deposited $6,000 on September 28, 2012, consisting of funds another person loaned him. Defendant cannot explain a $2,000 deposit on October 18, 2012; a $700 deposit on November 13, 2012; and a $2,500 deposit on November 15, 2012. However, some of these funds may have been from the $5,000 check Defendant wrote to Virginia Pro Team Concepts, as Defendant testified the $5,000 eventually was returned to the Wells Fargo account. On November 16, 2012, there is a $3,200 check Defendant wrote that he cannot explain.[3] Defendant cannot explain the source of $2,000 he deposited into the account on December 4, 2012; $1,900 deposited on December 14, 2012; $1,521 deposited on December 17, 2012; and $300 deposited on December 20, 2012. On December 24, 2012, there is a series of deposits in the amounts of $102.12, $100.00, and $100.00 that Defendant testified may have been Christmas gifts. Defendant cannot explain the source of a $400 deposit on December 31, 2012; a $300 deposit on January 7, 2013; and a $3,300 deposit on January 16, 2013. On January 17, 2013, there is a $3,200 check Defendant wrote that he cannot explain.[4] Defendant also cannot explain the source of deposits made on the following days in the following amounts: $1,200 on January 29, 2013; $420 on February 1, 2013; $750 on February 4, 2013; $2,100 on February 13, 2013; $200 on February 19, 2013; $102.12 on February 21, 2013; $900 on February 25, 2013; $750 on March 4, 2013; $2,200 on

---

[3] This $3,200 check appears to have been for rent for the house in which Defendant lives. The lease for the time period from August 2012 to August 2013 reflects the monthly rent as $3,200 per month. Pl.'s ex. 7. In addition, there is a check for $3,200 made out the landlord attached to the lease with a check number matching the number in the account statements. *Id.*

[4] Again, this $3,200 check appears to have been for rent for the house in which Defendant lives. Attached to the lease is a check for $3,200 made out to the landlord with a check number matching the number in the account statements. Pl.'s ex. 7.

March 18, 2013; and $4,466.11 on March 28, 2013. Defendant testified some of the deposits he is unable to explain may have been gifts from other people who were attempting to help him. Defendant had $1,789.92 in his Wells Fargo account on April 11, 2013, which is the date he filed bankruptcy. Defendant did not turn the $1,789.92 over to the chapter 7 trustee.

21. In addition, Plaintiff's counsel questioned Defendant about his First Federal account number *9766. Pl.'s ex. 9. Defendant opened the account with $60,000 on May 24, 2012. Defendant cannot explain what was done with the following amounts of money withdrawn from this account on the following dates: $600 on June 22, 2012; $2,000 on June 22, 2012; $8,000 on June 25, 2012; $5,500 on June 25, 2012; $3,300 on July 2, 2012; $1,100 on July 16, 2012; $2,000 on July 16, 2012; $2,000 on July 16, 2012; and $25,000 on July 23, 2012. By August 31, 2012, there was only $31.54 left in this account. Defendant had a second First Federal account with account number *9732. Pl.'s ex. 10. A comparison of the statements for the two accounts suggests that some of the withdrawals from account number *9766 were then deposited into account number *9732, including the $8,000 withdrawal on June 25, 2012; the $5,500 withdrawal on June 25, 2012; the $3,300 withdrawal on July 2, 2012; the $1,100 withdrawal on July 16, 2012; the $2,000 withdrawal on July 16, 2012; and the $2,000 withdrawal on July 16, 2012. Out of the withdrawals from account number *9766 about which Defendant was questioned, this reconciliation of the two First Federal accounts leaves $27,600 in withdrawals from account number *9766 that are unexplained.

22. With respect to Defendant's First Federal account number *9732, on June 25, 2012, there is a $5,500 check that was a gift Defendant made to his church. On June 27, 2012, Defendant made an $8,330 check card purchase at Diamonds International in New York, New York, and on June 30, 2012, he made a $2,991.49 check card purchase with Carnival Dream.

There are numerous other purchases from this account in smaller amounts about which Defendant was not questioned.

**CONCLUSIONS OF LAW**

**A. 11 U.S.C. § 523(a)(5) and (a)(15)**

Title 11, section 523(a)(5) of the United States Code excepts from discharge "any debt . . . for a domestic support obligation." Section 523(a)(15) excepts from discharge "any debt . . . to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record . . . ." As part of the 2005 amendments to the Bankruptcy Code, "[s]ection 523(a)(15) now provides, unqualifiedly, that a property settlement obligation encompassed by section 523(a)(15) is nondischargeable." 4 *Collier on Bankruptcy* § 523.23 (16th ed.). "Thus, in individual cases under chapters 7 and 11 and in cases under chapter 12, all of which base dischargeability on the subsections of section 523(a), the distinction between a domestic support obligation and other types of obligations arising out of a marital relationship is of no practical consequence in determining the dischargeability of the debt." *Id*. Congress also deleted the reference to section 523(a)(15) from section 523(c)(1) through the 2005 amendments, meaning "debts falling under section 523(a)(15) are no longer included in the category of debts that are discharged automatically if a party does not obtain a determination of nondischargeability from the bankruptcy court." *Id*. Based on the language in the Marital and Property Settlement Agreement and Amendment and the testimony at trial, the Court concludes that the $83,165.45 debt for which Plaintiff seeks a determination of nondischargeability is a nondischargeable debt under 11 U.S.C. §§ 523(a)(5) and (a)(15). This

$83,165.45 includes the $34,105.85 in credit card debt Defendant was obligated to pay under the Marital and Property Settlement Agreement and Amendment that Plaintiff paid because Defendant failed to satisfy this debt and because her credit was at risk as a result of her name being on the cards. *See Schweitzer v. Schweitzer* (*In re Schweitzer*), 370 B.R. 145, 152 (Bankr. S.D. Ohio 2007).

**B. 11 U.S.C. § 727(a)(3)**

Under 11 U.S.C. § 727(a)(3), a court may deny a discharge to a debtor if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." Plaintiff has the burden of proving an objection to discharge under section 727 by a preponderance of the evidence. *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994); Fed. R. Bankr. P. 4005. Plaintiff "must make an initial showing that (1) the debtor failed to keep and preserve adequate financial records, and (2) such a failure makes it impossible to ascertain the debtor's financial condition." *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 354 (4th Cir. 2007). "[A] bankruptcy debtor is not required to maintain perfect records." *Id*. at 355; *see also Haskell v. Shigo* (*In re Shigo*), No. 95-1959, 1996 WL 405223, at *2 (4th Cir. July 19, 1996). "A debtor is, however, obliged by the statute to preserve sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs." *Id*.

With respect to Defendant's First Federal account number *9766, Defendant's records and testimony fail to account for at least $27,600 in withdrawals from this account. Particularly

troubling is the $25,000 identified as a "Transfer Withdrawal" on the statements on July 23, 2012. Pl.'s ex. 9. Defendant provided no information or records regarding what he did with this $25,000. He also did not provide any identifying information that would allow a person to locate another account to trace what happened to this $25,000. As for the Wells Fargo account, Defendant did not provide any records or identifying information for the account in which he deposited the $5,000 check he wrote to his business, Virginia Pro Team Concepts. Additionally, Defendant was unable to explain numerous deposits into his Wells Fargo account and the source of the funds deposited. The failure to provide this information in connection with the First Federal and Wells Fargo accounts was not justified under all of the circumstances of this case. Consequently, the Court concludes that Plaintiff has met her burden of proof under section 727(a)(3) and that Defendant should be denied a discharge.

**C. Other Causes of Action**

Plaintiff asserts the debt owed to her is nondischargeable under 11 U.S.C. 523(a)(6) as well as section 523(a)(5) and (a)(15). She also objected to Defendant's discharge under 11 U.S.C. §§ 727(a)(2), (a)(4), and (a)(7) in addition to section 727(a)(3). The Court has concluded the debt for which Plaintiff seeks a nondischargeability determination is nondischargeable under section 523(a)(5) and (a)(15) and that Defendant, pursuant to section 727(a)(3), should be denied a discharge. Plaintiff is entitled to no further relief on her other causes of action. These other causes of action are, therefore, deemed moot.

## **CONCLUSION**

For the reasons set forth herein, Defendant owes Plaintiff a $83,165.45 debt that is nondischargeable under 11 U.S.C. §§ 523(a)(5) and (a)(15).  In addition, Defendant's discharge is denied under 11 U.S.C. § 727(a)(3).  Plaintiff's causes of action under 11 U.S.C. § 523(a)(6) and 11 U.S.C. §§ 727(a)(2), (a)(4), and (a)(7) are moot.

AND IT IS SO ORDERED.

**FILED BY THE COURT
06/04/2014**



Entered: 06/04/2014

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina